UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Lisa Swift | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 17 CV 50051 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) ) ) | |
| Defendant. | ) ) | |

## **MEMORANDUM OPINION AND ORDER**

This is a Social Security disability appeal. Plaintiff Lisa Swift was injured in three workplace incidents, one in March 2012 and two in October 2013, that eventually caused her to stop working as a teacher for Easter Seals. She alleges that she continues to experience pain, mostly in her back but also in her hands, legs, and neck (the problems being more on the right side). One limitation is that she cannot sit for more than 10 to 15 minutes at a time. She also suffers from Stage III kidney disease and migraines, and takes pain medication.

Plaintiff has been treated or examined by various doctors. After the incidents, she was treated for a while by doctors at Physicians Immediate Care. She received injections from Dr. Dahlberg, a pain management specialist, who believed that plaintiff had a sciatic nerve injury or perhaps a piriformis muscle injury suffered when she backed into the corner of a desk to avoid an agitated student. Plaintiff was treated by Rockford Nephrology Associates for her stage III kidney failure. Throughout this period, plaintiff was treated by her primary care physician, Dr. Timothy Flynn, who opined that plaintiff's medical problems, in combination, would prevent her from working.

---
[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Plaintiff was also examined, on two occasions, by Dr. Jesse Butler, who was hired by plaintiff's former employer to perform an "independent medical examination" as part of a pending worker's compensation case that later settled. In his two reports, Dr. Butler painted a dramatically different picture than did Dr. Flynn. Dr. Butler concluded that plaintiff was malingering (*i.e.* engaging in "symptom magnification"), was abusing narcotics, and was "manipulating different providers to obtain narcotics." R. 613. He stated that the only treatment she should receive was being sent to "a narcotic detox program." *Id.* In addition to the sharply contrasting opinions of Dr. Flynn and Dr. Butler, there was also an opinion from Dr. Reynaldo Gotanco, a State agency physician, who opined that plaintiff could do light work. No impartial expert was called at the administrative hearing to adjudicate among these opinions.

On August 15, 2016, the administrative law judge ("ALJ") issued a 9-page decision finding plaintiff not disabled. At Step Two, the ALJ found that plaintiff had the following severe impairments: "obesity, degenerative disc disease of the lumbar spine, stage III chronic kidney disease, headaches and hypertension." R. 22. But the ALJ concluded that plaintiff was nonetheless capable of light work based on the following findings: (i) plaintiff made several inconsistent statements; (ii) the objective medical evidence, such as negative straight leg raising tests, did not provide "strong support" for her allegations; (iii) she had not been "referred for surgical intervention" or gone to the emergency room; and (iv) there was a treatment gap of approximately six months at one point. As for the medical opinions, the ALJ gave "great weight" to Dr. Gotanco's opinion, "some weight" to Dr. Butler's opinion, and "little weight" to Dr. Flynn's opinion.[2]

---

[2] The ALJ also collectively gave "some weight" to temporary work restrictions imposed by various doctors at Physicians Immediate Care, but none of these doctors rendered any formal opinions.

Plaintiff's main argument for remand is that the ALJ gave Dr. Flynn's opinion too little weight and Dr. Butler's too much weight. Additionally, plaintiff argues that the ALJ cherry-picked the record, engaged in doctor playing, and failed to follow the treating physician rule. The Court finds that these arguments collectively justify a remand.

A few general observations should be noted at the outset. First, it is undisputed that the ALJ did not follow the procedures required by the treating physician rule. This Court has often remanded for not explicitly applying the two-step treating physician rule, in particular the six checklist factors in the second step. One benefit of applying the checklist (besides the fact that it is the Social Security Administration's own regulation that it is bound to follow) is that it helps develop the underlying facts that will aid both the ALJ and this Court in the subsequent analysis. The first two checklist factors, for example, require consideration of the length and nature of the treatment relationship. The ALJ did not make these determinations. The ALJ's summary of the medical visits gives the impression that plaintiff first saw Dr. Flynn on May 20, 2014. R. 25. But this is contrary to Dr. Flynn's opinion, which states that he had been treating plaintiff since 2008 and saw her every month or two since that time. R. 458. That is evidence of a longer and more in depth relationship. At this point, the Court need not pin down these details, as this is a task for the ALJ on remand, but it illustrates one of the benefits of explicitly following the treating physician rule.

Second, although the treating physician rule contains specific analytical steps, it also sets forth the larger principle that, all things being equal, a treating physician's opinion deserves some deference. *See Koelling v. Colvin*, 2015 WL 6122992, *8 (N.D. Ill. Oct. 16, 2015) ("within the weighing process, treating physician opinions receive particular consideration"). For this reason, the proper application of the treating physician rule should result in the total rejection

(*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and adopted by the adjudicator."). Here, although the ALJ nominally gave Dr. Flynn's opinion "little" weight, the practical effect was that the ALJ gave it "no" weight because the ALJ did not credit any aspect of the opinion.

Third, consistency is a central principle embodied in the treating physician rule. The fourth checklist factor explicitly refers to "the consistency of the opinion with the record as a whole." But in addition to assessing the consistency of an individual opinion, there is a broader notion of consistency arising from the fact that the ALJ must compare multiple opinions. As this Court has noted, it is important that the ALJ employ the "same metrics" and the "same level of rigor" in evaluating multiple opinions. *Vandiver v. Colvin*, 2015 WL 8013554, *3 (N.D. Ill. Dec. 7, 2015) ("the checklist has its greatest usefulness as a tool for making an apples-to-apples comparison between opinions.").

With these principles in mind, the Court first considers the ALJ's analysis of Dr. Flynn's opinion. On May 12, 2015, Dr. Flynn completed a two-page form titled "Physical Residual Function Capacity Medical Source Statement." Ex. 10F. He opined (among other things) that plaintiff had been diagnosed with "chronic back pain, sciatica, peripheral neuropathy/neuralgia, depression with anxiety, chronic kidney disease, [and] migraines"; that she would only be able to sit or stand two hours in a normal workday; that she would be off-task more than 30% of the day; and that she would miss five or more days a month. If accepted, these limitations would prevent plaintiff from working full-time. The ALJ rejected this opinion based on the following explanation:

> These restrictions, however, are inconsistent with the objective medical evidence, which does not reveal any positive straight leg raising, muscle weakness, or issues with gait or ambulation. Furthermore, the claimant's MRI of the lumbar spine did not reveal any abnormalities that would result in the level of functional restrictions that Dr. Flynn provides in this assessment.

R. 27.

Plaintiff attacks this explanation on two main grounds. The first is cherry-picking. Plaintiff asserts that the ALJ's conclusion about the medical record—*i.e.* that there were not "any" supportive findings—was incorrect. In her two briefs, plaintiff identifies various findings about muscle weakness and other issues (including limited grip strength, stiffness, and decreased mobility) that undermine the ALJ's zero-evidence statement. *See* Dkt. #13 at 5-7; Dkt. #15 at 1-2. The Court need not further analyze these specific findings because it finds that plaintiff has raised a colorable argument that the ALJ overlooked this evidence. This conclusion is also indirectly supported by the Government's brief, which contains a series of "yes, but" statements in which the Government concedes that a particular piece of evidence supports plaintiff but then argues that it is small compared to other, supposedly stronger evidence. *See, e.g.*, Dkt. #14 at 5 ("A physical examination revealed right paraspinal musculature spasm and tenderness of the sacral muscles, *but* her gait was normal and numb muscle weakness was noted.") (emphasis added). Unlike the ALJ, the Government at least explicitly confronted this contrary evidence. And although the Government's arguments might prove convincing on remand, they cannot be relied on here because the ALJ did not make these same arguments. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced"). As a result, we are left in doubt as to whether the ALJ considered this contrary line of evidence that potentially

5

supports Dr. Flynn's opinions. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion).

Even if the Court were inclined to view the ALJ's zero-evidence statement as a rhetorical overreach, the ALJ improperly "played doctor" in discussing the objective medical evidence. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves"). In this case, as in many disability cases involving spinal-related impairments, the record contains numerous examination and diagnostic findings—some negative and some positive—that collectively create a large pile from which to choose. For this reason, it is relatively easy for each side—to borrow a metaphor about legislative history—to pick out their "friends" from the crowded record. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

In her opening brief, plaintiff identifies four specific instances of doctor playing. Dkt. #13 at 7. Again, given the Court's decision to remand, it is not necessary, nor would it be productive, for this Court to sort through all these competing arguments, in part because they require some medical expertise to even evaluate and also because the Court is persuaded that the ALJ engaged in doctor playing.[3] But one example is the following: "the claimant's MRI of the lumbar spine did not reveal any abnormalities that would result in the level of functional restrictions that Dr. Flynn provides in this assessment." R. 26. This sentence reflects the ALJ's judgment that the

---

[3] For example, plaintiff makes the following argument: "While plaintiff had some negative SLR tests and did not require a cane to ambulate, that does not mean that she did not have significant, chronic pain from her back condition." Dkt. #13 at 7. Another unjustified medical assumption, according to plaintiff, is the following: "while the ALJ implies that she felt plaintiff did not have disabling pain because of her MRI findings, lack of positive EMG in the lower extremities, and lack of positive SLR; those facts would not rule out that plaintiff had piriformis syndrome." *Id.* at 7-8 (footnote omitted). Plaintiff also suggests that the ALJ lacked the expertise to interpret the findings about plaintiff's renal disease and the role it may have played in causing neuropathy.

MRI basically contained no *serious* abnormalities. But this implied judgment is one that the Seventh Circuit has held may not be made by ALJs. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (remanding because the ALJ improperly played doctor: "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."). One reason that the ALJ was forced to play doctor is that the ALJ did not call an impartial medical expert at the hearing, and neither Dr. Butler nor Dr. Gotanco clearly addressed these issues. For this reason, on remand, the ALJ should call an expert witness. HALLEX I-2-34A.2.

In sum, the ALJ's rejection of Dr. Flynn's opinion was not based on a complete and thorough review of the record. It is true that Dr. Gotanco briefly discussed some of the medical evidence, but his summary is cursory and did not provide any clear guidance and, in particular, did not address all of the issues analyzed by the ALJ.

The Court next turns to plaintiff's argument about Dr. Butler. As noted above, he concluded that plaintiff was a malingering drug addict manipulating the system to get more narcotics. This was certainly a harsh judgment and one that carries the potential to "dominate all [other arguments] like the proverbial skunk thrown in the jury box." *See Potega v. Berryhill*, 2017 WL 2461549, *4 (N.D. Ill. June 7, 2017). As explained below, the Court agrees that the ALJ should have analyzed this opinion with a more critical eye before accepting it.

One preliminary question is whether the ALJ fully endorsed Dr. Butler's conclusions in their strongest form. On the one hand, in the analysis section, the ALJ ambiguously gave Dr. Butler's opinion "some" weight and only offered the following mixed-message: "[Dr. Butler's] opinion does not appear to be an accurate overall assessment of the claimant's ability to function in a competitive work environment, but is nonetheless supportive of finding the claimant not

disabled." R. 27. However, in the earlier narrative section, the ALJ accepted Dr. Butler's conclusions at face value and even, at one point, suggested that they were endorsed by others (more on this below). For this reason, the Court concludes that Dr. Butler's conclusions played a significant role in the ALJ's decision. In its brief, the Government seems to agree, arguing that the ALJ properly relied on these two reports. *See, e.g.*, Dkt. #14 at 9 ("*Particularly troubling* was Dr. Butler's note, after summarizing the medical records, that plaintiff was on narcotic pain medication from multiple providers.") (emphasis added).

One of plaintiff's specific criticisms is that the ALJ failed to acknowledge the possible bias from the fact that the two allegedly "independent" reports were, in fact, not independent because they arose out of an adversarial worker's compensation case (*i.e.* Dr. Butler was hired by plaintiff's former employer). But plaintiff has not cited to any case law suggesting that there is a bright-line rule of exclusion for these types of reports. Indeed, the Government could make the same argument about opinions from treating physicians, friends, and family members. Plaintiff appears to be asking merely that the ALJ acknowledge, in some way, the possibility of bias. Plaintiff notes that the sixth checklist factor is a catchall category for any factors "supporting or contradicting" a medical opinion. The Government does not cite to any relevant case law either, nor offer any other suggestions about how to analyze this issue, and instead adheres to its unqualified position that Dr. Butler's reports were properly relied upon.[4]

Rather than analyzing this more abstract question of whether reports from worker's compensation cases are generally unreliable, the Court finds that it is more productive to focus on the specific reasoning and evidence set forth in these reports. This is something the ALJ did

---

[4] *See* Dkt. #14 at 9 ("The fact that his examinations were done pursuant to a workers' compensation claim does not diminish the validity of his examination findings."); *see also id.* at 13 ("The fact that Dr. Butler's opinion was developed during a workers' compensation proceeding is not material. It is still a medical opinion the ALJ was required to discuss.").

8

not do. A review of these reports raises questions about their cogency. In general, they contain no meaningful analysis or explanation despite giving the surface appearance of doing so. The first report (September 2013) contains a long and detailed narrative summary of plaintiff's treatment with a number of doctors and nurses, including Dr. Strawser, nurse Elliot, nurse Pearson, Dr. Buzzard, Dr. Dahlberg, physician assistant Crum, and Dr. LaRue-Headon. However, with one possible exception of one unnamed person (discussed below), none of these individuals ever suggested that plaintiff was malingerer. Dr. Butler's opinion, therefore, was the outlier.

Dr. Butler also did not explain what led him to conclude that plaintiff was manipulating doctors to get more narcotics. There is again very little analysis. At the end of the second report, Dr. Butler asserted that plaintiff's "longstanding use of Dilaudid" was taken only for "bowel issues as opposed to back pain." R. 616. But it is not clear why this statement, even if true, proves there was narcotics abuse. Moreover, it rests on the unexplained assumption that plaintiff had been using this medication for a long time. Perhaps Dr. Butler is correct in this assertion, but it is not clear based on the current record. For example, in his second report, which contains the assertion about Dilaudid use, Dr. Butler listed plaintiff's current medications, and Dilaudid was not on the list. R. 615.

In sum, in reading the long narrative summaries in Dr. Butler's reports, there is no indication or foreshadowing (again, with the one ambiguous exception) that dramatic conclusions will pop up at the end. Those conclusions feel as if they were pulled from out of thin air, or even cut and pasted from some other document containing a different narrative history.

Now, as for the possible exception, the first report does include the following anecdote at the end of the narrative section:

> On April 8, 2013, the patient presented to Myofascial Physical Therapy for an initial evaluation. A John Barnes Myofascial Release Program was recommended 2-3 times per week for 4 weeks.
>
> On May 11, 2013 the patient was reevaluated at therapy. She complained of the same hip pain rated 7/10. *She stated she was unable to sit at all even when driving in the car. However, it was noted she was viewed sitting in the car and driving and sitting in the waiting room without difficulty.*

R. 610 (emphasis added). The ALJ relied on this description to reach the broader—and more damning—conclusion that "multiple sources" (*i.e.* not just Dr. Butler) had concluded that plaintiff was malingering and abusing drugs. Specifically, the ALJ stated the following:

> Multiple sources noted that the claimant was also vague and manipulative in obtaining narcotic medications. In fact, Dr. Butler went so far as to indicate that she exaggerated her symptoms and no longer needs any medical treatment for her back pain.

R. 26-27 (emphasis added).

The concern, again, is that the ALJ accepted the anecdote completely and uncritically despite there being questions about its reliability. First, as plaintiff notes, the "source" of these observations was unnamed. Second, neither side provided a citation to the underlying document from which Dr. Butler retrieved this anecdote, and in this Court's review of the record, it did not find such a document. The Court is not claiming that no such document exists, but merely that it has not been able to view the original statement in context. Third, this anecdote relies on a technique—peeping out the window and observing a claimant privately in the parking lot—that has the potential for abuse, at least in this Court's view. Fourth, because Dr. Butler's reports were only submitted after the hearing, plaintiff was never given a chance to respond to them. Fifth, it is not clear exactly what the "source" thought was contradictory. Plaintiff was observed sitting in, and driving, a car. This fact was then juxtaposed against the following statement plaintiff supposedly made: "she was unable to sit at all *even when driving* in the car." R. 610

10

(emphasis added). Taken literally, this statement suggests a hard-to-imagine scenario in which plaintiff, like users of standing desks, was standing *while* driving. The Court assumes (though it is not entirely sure) that the writer was trying to state that plaintiff had claimed that she *never* drove a car. But if so, then this statement would be at odds with many other statements in the record where she merely stated that she could only sit for *limited* periods. *See, e.g.*, R. 266 (stating that she does drive a car, but can only do so for "short distances"). These statements would not be inconsistent with having driven to the therapy appointment, assuming that it was not a long drive. Sixth, and finally, even if one construed this anecdote in its strongest form, it is only a false statement about plaintiff's driving abilities. In other words, it does not directly relate to abusing narcotics or manipulating doctors.

For all these reasons, the Court finds that the ALJ should have subjected this anecdote to more critical analysis before relying on it to bolster the strongly prejudicial conclusions of Dr. Butler.

In sum, the ALJ erred by only providing a vague explanation for rejecting Dr. Flynn's opinion while readily accepting Dr. Butler's opinion without subjecting it to any comparable scrutiny. Dr. Flynn was a treating physician whose opinion generally should be given some deference, all things being equal. Moreover, Dr. Flynn was the only doctor who opined on all of plaintiff's impairments in combination. Neither Dr. Butler nor Dr. Gotanco referred to plaintiff's kidney problems or her migraines. This is yet another reason why Dr. Flynn's opinion should not have been so lightly dismissed.

Although the above issues are sufficient to justify a remand, the Court briefly will comment on the ALJ's credibility analysis. The ALJ concluded that plaintiff made four or five inconsistent statements. *See* R. 26-27. However, the Court finds that many of these alleged

11

inconsistencies rest on undeveloped or questionable factual foundations. One of these was the observation discussed above about plaintiff driving to her a therapy appointment. Another is the following statement: "While [plaintiff] reported that her medications only help up to 20 minutes at a time, this complaint was never made to her treating sources." R. 26. Although the ALJ did not provide a citation, this assertion seems to rest on Exhibit 6E, a Pain Questionnaire plaintiff completed, which contained the following pre-printed questions (in bold), along with plaintiff's handwritten answer: "**Does the medicine relieve the pain? How soon?** A little   15-20 minutes." R. 257. Contrary to the ALJ's interpretation, the Court reads this statement to mean that the medicine took 15 to 20 minutes to *begin* working, not that it *stopped* working in that amount of time. Otherwise, the question would have asked: "How long?". Another alleged inconsistency was the assertion that plaintiff was able to garden for some unspecified amount of time even though she claimed she could not "sit or stand for long periods of time." R. 26. It is not obvious why this was inconsistent given the qualification of the word "long" and given plaintiff's repeated statements that sitting was often more painful than moving around. *See generally Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (an ALJ should examine daily activities "with care" because "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time").

     On remand, the ALJ should more carefully consider these and the other issues discussed above before concluding that plaintiff lacked credibility. The ALJ should also call a medical expert to explain and help resolve the widely divergent medical opinions in the record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: May 10, 2018    By: _____
Iain D. Johnston
United States Magistrate Judge